FILED
2014 Mar-20  PM 04:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **COUNSEL FINANCIAL SERVICES LLC,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:11-CV-1051-RDP** |
| | } | |
| **E KIRKSEY WOOD, JR., et al.** | } | |
| | } | |
| **Defendants.** | } | |
| | | |
| **ARCHIE CLEVELAND LAMB,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:11-CV-1592-RDP** |
| | } | |
| **COUNSEL FINANCIAL SERVICES LLC,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This matter is before the court on the Motion for Summary Judgment filed by Archie Lamb ("Lamb"), ACL Vortex Properties, LLC, Vortex Holdings, LLC, and ACL Vortex Films, LLC, (collectively referred to as the "Lamb Parties") (Case No. 11cv1051 Doc. # 143; Case No. 11cv1592 Doc. # 30).  The matter has been fully briefed.  (Docs. # 143, 145, 162, 181).[1]

## I.    Relevant Facts

### A.    The Adversary Proceeding

In 2006, Lamb and the Lamb Firm (and the other Lamb parties through them) had financing through Law Finance, a California lender.  Plaintiff here, Counsel Financial Services, LLC ("CFS")

---

[1] Unless otherwise specified, all further docket entry cites will refer to the docket entries in Case No. 11cv1051.

is another entity that provides financing to plaintiffs' lawyers. CFS was founded by three plaintiffs' lawyers: Perry Weitz, Arthur Luxenberg and Joe DiNardo. The founders also recruited a former judge to work with them to gain influence. (Doc. # 143-1, p. 164). CFS admits that its members have expertise in valuing plaintiffs' cases. (Doc. # 143-1, p. 167).

CFS pays representatives one per cent (1%) of the line of credit granted as a commission for soliciting lending relationships with lawyers. (Doc. # 143-1, p. 172). Through one of its representatives, CFS learned that Lamb's loan with Law Finance was coming up for renewal. (Doc. # 143-17, p. 18-19). CFS used its representative's relationships to approach Lamb to see if he would switch his financing from Law Finance to CFS. (Doc. # 143-17, p. 19) CFS also searched online databases and became aware of the Lamb Firm's cases. (Doc. # 143-17, p. 22). CFS actively sought out Lamb's business and paid $70,000 in fees to compensate agents to solicit Lamb. (Doc. # 143-17, p. 20).

CFS was aware that the Lamb firm was financing businesses other than the law firm and that the Firm was used to pay Lamb's personal expenses. (Doc. # 143-3, p. 34; 143-17, p. 52). CFS confirmed through Bryan Peoples, who provided management and accounting services to the Lamb Firm, that if it loaned funds to the Lamb Firm, it would be financing the expenses of Lamb, the Lamb Firm, Lamb's interest in KL Holdings and each of the Vortex Companies. (Doc. # 143-17, ex. 5).

> Mr. Peoples confirmed that the 4 Vortex companies, the Healthcare Funding company, and the land/timber development company (KL Holdings) have all been, to varying degrees, funded directly and/or indirectly by the Lamb Firm, LLC via Law Finance loan advances to The Lamb Firm and the Lamb Firm's operating profits. …Clearly the pass-through (to Vortex) of Law Firm advances to The Lamb Firm continues to the present day.

(Doc. # 143-10).

2

Peoples provided to CFS financial statements he or his firm had prepared on behalf of Lamb and the Lamb Firm. (Doc. # 143-3, p. 141, Doc. # 143-4, p. 43). Peoples provided the same package of financial information to CFS that he had sent to Law Finance. (Doc. # 143-4, p. 43). Relative to Lamb's December 31, 2007, financial statements that CFS asserts should have reflected taxes owed for 2006, Peoples did not include the tax loss on the statement because, based on Lamb's 2007 losses, Peoples assumed there would be no taxes owed for 2006. (Doc. # 143-3, p. 204). Peoples and Lamb discussed this issue and the estimate that the 2006 taxes due would be offset by the loss in 2007. (Doc. # 143-3, p. 205). Based on the 2007 losses, it didn't "cross his mind" to put either the loss or the credit on the financial statements. (Doc. # 143-3, p. 205).

The financial statement for Lamb placed a value on the Lamb Firm of $75,000,000. (Doc. # 143-7, Ex. 77). As evidence to support this valuation, the Lamb Firm's Master Case list was attached. (*Id.*). This Master Case List contains a column titled "Case Summary/Value." The List also contains a column titled "Referring Attorney/Co-Counsel & Percentages." In most instances, on the original Master Case List, no value is listed for the individual cases. (*Id.*). In fact, examination of the List shows a value is only placed on three cases: a metablolife ingestion claim listed to have a value of "$1.7 m" which also lists Kirk Wood and Inge Johnson in the summary/value column; a bait and switch case listed to have a value of $50,000 which lists a referring attorney; and a PPA ingestion case valued at "$1.5m" which lists Inge Johnstone/Micah Adkins/Ann Riley" under the "Responsible Attorney" column. (Doc. # 143-7, Trial Ex. 77). Although many cases have referring attorneys and/or co-counsel listed, only in a few instances is the fee-sharing percentage between the lawyers set forth. (*Id.*). The List contains cases which are clearly

being handled by other attorneys as evidenced by, for example, a note that "this case has been assigned to Dennis Pantazis; Ann left a message with Tammy to all with an update." (*Id.*).

CFS's team of legal experts analyzed the Lamb Firm's case list. (Doc. # 143-1, p. 167; Doc. # 143-2, p. 15). In evaluating the Lamb Firm's cases, CFS's experts disagreed with many of the Lamb Firm's projections and adjusted the projected values and timing of the cases to reflect CFS's opinions based on its own expertise. (Doc. # 143-17, p. 20, Ex. 8; Doc. # 143-7, Ex. 53). CFS recognized that Lamb had fee sharing arrangements with other firms.

> Lamb has projected a net fee of $10 million [in the Qui Tam case]. The case is extremely worthwhile, and seems highly likely to command a very substantial fee…However, $10 million sounds much too high to us. First, the total fee would have to be in the nature of $20 million to provide $10 million each to Wiggins and Lamb. Second, the government would have to obtain, and the defendants would have to be in a position to pay, a judgment in the area of $120 million in order to afford the plaintiff the $60 million necessary to support a $20 million fee. Therefore, I believe that Lamb will earn a 7-figure fee on this case, rather than one of 8-figures. Resolution is expected by January, 2009, which appears somewhat early for a case of this magnitude.

(Doc. # 143-7, Ex. 53).

On June 7, 2007, CFS offered Lamb financing, representing that CFS's terms were more favorable than Law Finance's terms. (Doc. # 143-5, Exs. 5 and 6). The term sheet containing the offer expressly states that it includes all material terms and made no mention of restricting the use of the loan proceeds. (Doc. # 143-5, p. 42). In making the offer, CFS was aware that Lamb was drawing out more money from the firm than he earned, *i.e.,* he had negative equity in the firm. (Doc. # 143-5, p. 58). More specifically, the financial statements prepared by Peoples which were supplied to CFS reported that from January 2007 - April 2007 Lamb had already withdrawn over $135,000 per month for personal expenses. (Doc. # 143-10).

CFS periodically inspected the Lamb Firm's books and records.  (Doc. # 143-19; *see also* Doc. # 143-7, Exs. 79 and 52).  Lamb instructed his employees to provide CFS with any and all information and documents requested.  (Doc. # 143-19).  CFS never complained that Lamb failed to furnish any financial information.

In April 2008, CFS renewed the loan and increased the total debt from $16,000,000 to $17,500,000.  (ND AL BK Case No. 10-00052, Doc. #  84).  CFS changed two principal terms of the financing:

(1)     The threshold amount per case above which The Lamb Firm agreed to pay 30% of settlement funds to reduce the principal was reduced from $100,000 to $25,000; and

(2)     The Lamb Firm was permitted to immediately re-borrow the 30% principal reductions.

(ND AL BK Case No. 10-00052, Doc. # 84. at ¶¶ 9, 17).  It is in connection with this additional financing that the alleged misrepresentation regarding the *Parry v. Bausch and Lomb* case was made.  (Docs # 162-15 and 162-17).  CFS asserts that it was unaware that anyone else would receive a portion of any fee collected in the *Parry v. Bausch and Lomb* case.  (Doc. # 162 at 11-12).  However, the initial Master Case list provided by Lamb to CFS listed a referring attorney on the case.  (Doc. # 143-7, Ex. 77).

In conjunction with the April 2008 loan, the Lamb Firm submitted its November 30, 2007, balance sheet and income statement, Lamb's December 31, 2007, personal financial statement, an updated case list, and an updated budget.  (Doc. # 143-3, pp. 203-204).  CFS re-analyzed the case projections and again formed its own estimate of the value of Lamb's cases, cash flow and assets.  (Doc. # 143-7, Ex. 53).  At this time, CFS requested that the Lamb Firm reduce its travel and salary

expenses as it monitored cases.  The Lamb Firm complied.  (Doc. # 143-7, Ex. 56; Doc. # 143-4, pp. 67-69).

Lamb defaulted on the loan and, in 2009, CFS filed suit against Lamb and the Lamb Firm in New York.   On July 24, 2009, CFS obtained a judgment against Lamb and the Lamb Firm in the default action in the amount of $18,796,644.92.  CFS thereafter domesticated the judgment in the Circuit Court of Jefferson County and began collection efforts.  As of April 22, 2010, CFS asserts that the outstanding balanced owed by Lamb and the Lamb Firm was $21,185,834.78.  (ND AL BK Case No. 10-00052, Docs. # 85-1 at 13 and # 85-6).

On January 28, 2010, Archie C. Lamb, Jr. filed a petition in the United States Bankruptcy Court for the Northern District of Alabama bearing case number 10-00465-TBB-7.  (Doc. # 150-1).  On April 10, 2010, CFS filed a Complaint in an adversary proceeding in the Bankruptcy Court for the Northern District of Alabama against Lamb seeking to declare Lamb's debt to CFS to be non-dischargeable.  (ND AL BK Case No. 10-00052, Doc. # 1).

CFS's original Complaint contained five counts asserting that Lamb's debt to CFS is non-dischargeable:

Count I:        Under 11 U.S.C. § 523(a)(2)(a), CFS asserted that Lamb recklessly defrauded CFS;

Count II:       Under 11 U.S.C. § 523(a)(2), CFS asserted that Lamb made false and misleading misrepresentations about his and his firm's financial condition;

Count III:      Under 11 U.S.C. § 523(a)(2)(a), CFS asserted that Lamb defrauded CFS by submitting materially false financial information regarding his and his firm's financial condition;

Count IV:      Under 11 U.S.C. § 523(a)(4), CFS asserted that Lamb committed defalcation while acting in a capacity of trust for CFS; and

Count V:      Under 11 U.S.C. § 523(a)(6), CFS asserted that Lamb converted funds intended for his law firm for personal use.  (ND AL BK Case No. 10-00052, Doc. # 1).

On March 7, 2011, CFS filed an Amended Complaint containing four counts asserting exceptions to discharge under 11 U.S.C. § 523(a)(2)(a), § 523(a)(2)(B), § 523(a)(4), and § 523(a)(6). (ND AL BK Case No. 10-00052, Doc. # 85).

## II.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a

7

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

## III.    Analysis

A central purpose of the bankruptcy code is to provide the "honest but unfortunate debtor" with a fresh start.  *In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994). Not all categories of debt are equal, however, and in 11 U.S.C. § 523 Congress excepted certain types of debts from discharge. *Grogan v. Garner*, 498 U.S. 279, 287 (1991). The objecting creditor has the burden of proving each element of a dischargeability exception by a preponderance of the evidence. *Grogan*, 498 U.S. at 291.  If any one of the elements of an exception is not met, the debt is declared dischargeable.  *In re Miller*, 39 F.3d  at 304.  "Moreover, courts generally construe the statutory exceptions to discharge in bankruptcy liberally in favor of the debtor, and recognize that "[t]he reasons for denying a discharge ... must be real and substantial, not merely technical and conjectural." *In re Miller*, 39 F.3d at 304 (internal quotation marks omitted but quoting *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987) and in turn quoting *Dilworth v. Boothe*, 69 F.2d 621, 624 (5th Cir. 1934)).

As a preliminary observation, the original posture of the parties in this matter was not what one generally sees in cases such as this.  That is, it is notable that Lamb did not approach CFS in need of financing.  Lamb had financing through one of CFS's main competitors.  CFS researched its competitors' clients and sought to lure those clients' business (including Lamb's) away from competing lenders such as Law Finance.  Undoubtedly, Law Finance is now glad CFS did. The point here, however, is that CFS achieved this result by offering more attractive financing terms.  It is within this context that the court evaluates Plaintiff's claim that Lamb's debts are not dischargeable.

CFS advances a number of theories as to why the debt at issue here is not dischargeable.  The court evaluates CFS's arguments in turn.

A.      **Count I: 11 U.S.C. § 523(a)(2)(A)**

The Bankruptcy Code provides that a debtor cannot discharge a debt for money "to the extent [it was] obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).  "To prove that a debt is nondischargeable under § 523(a)(2)(A), a creditor must show that '(1) the debtor made a false representation to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation.'" *In re Heinz*, 501 B.R. 746, 760 (Bkrtcy. N.D. Ala. 2013) (quoting *In re Sears (Sears v. United States)*, 533 Fed.Appx. 941, 945-46 (11th Cir. 2013)).  "Plaintiff has the burden of proving each element of this § 523 action by a preponderance of the evidence."  *In re Heinz*, 501 B.R. at 760.

CFS argues that Lamb made misrepresentations or omissions in the following categories: (1) case valuations; (2) personal financial statements; and (3) law firm budgets.  (Doc. # 162 at 8-15).

CFS's challenge under § 523(a)(2)(A) to Lamb's financial statement falls short because such a challenge must be mounted under § 523(a)(2)(B).  To be sure, "Subsections 523(a)(2)(A) and (B) are mutually exclusive" because although subsection (B) is applicable only to written statements respecting a debtor's or insider's financial condition, subsection (A) excludes statements respecting a debtor's or insider's financial condition.  *Nangle v. Lauer (In re Lauer)*, 371 F.3d 406, 413 (8th Cir. 2004) (citing *First Nat'l Bank of Olathe v. Pontow*, 111 F.3d 604, 608 (8th Cir. 1997)).  Therefore, Plaintiff cannot satisfy the § 523(a)(2)(A) exception with reference to Lamb's financial statements.

With regard to case valuations, CFS claims that Lamb misrepresented gross fees as net fees and failed to disclose that some of the fee estimates listed in its Master Case List were actually owed to other lawyers. The Master Case List which was provided to CFS before the lending relationship began contains a column titled "Case Summary/Value" and a column titled "Referring Attorney/Co-Counsel & Percentages." (Doc. # 143-7, Ex. 77). A value is only placed on three cases: a metablolife ingestion claim listed to have a value of "$1.7 m" which lists Kirk Wood and Inge Johnstone in the summary/value column; a bait and switch case listed to have a value of $50,000 which lists a referring attorney; and a PPA ingestion case valued at "$1.5m" which lists Inge Johnstone/Micah Adkins/Ann Riley" under the "Responsible Attorney" column. (Doc. # 143-7, Ex. 77). Although many cases have referring attorneys and/or co-counsel listed, in few instances is the percentage split set forth. (*Id.*). The list also contains cases which are clearly being handled by other attorneys as evidenced by, for example, a note that "this case has been assigned to Dennis Pantazis; Ann left a message with Tammy to all with an update." (*Id.*).

In *Field v. Mans*, the United States Supreme Court noted that "some degree of reliance is required to satisfy the element of causation inherent" in a section 523(a)(2)(A) claim. 516 U.S. 59, 66 (1995). "Justifiable reliance is gauged by an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." *In re Vann*, 67 F.3d 277, 283 (11th Cir. 1995).

CFS had members who were or had been plaintiffs' lawyers. In fact, by their own admission, these lawyers had expertise in valuing cases. (Doc. # 143-1, p. 167). As any lawyer—particularly a seasoned plaintiff's lawyer—should know, where a referring relationship is disclosed, whether or not a percentage fee split is disclosed, a portion of that fee will be shared with the referring attorney.

Good referring lawyers are of great value to a plaintiff's attorney, but they don't work for free. CFS's asserted reliance on the Master Case list provided in June 2007 (along with its claim now that those cases listed without specific fee splitting percentages are due entirely to the Lamb Firm) is patently not "justifiable" under the circumstances of this case.

CFS further argues that the *Parry v. Bausch and Lomb* case was represented to be worth $1 million to the Lamb Firm. (Doc. # 163 at 11). This alleged representation was made after CFS had already entered into a lending relationship with CFS. CFS argues that it relied on this representation in extending further funds to Lamb. They base this alleged representation on an updated Master Case List provided to CFS in 2008. The updated List was prepared in a different format than the 2007 List. The 2008 Case list contains a column titled "Estimated Value" and contains no information regarding referral relationships. (Doc. # 162-15). Plaintiff argues that Wood misrepresented the *Parry v. Bausch and Lomb* case by stating that the *Bausch and Lomb* cases are all "in the *Renu* MDL and should be considered as one ... Yes, combine those into one case at $1M." (Doc. # 162-17 at 2). However, what CFS fails to acknowledge is that, on the updated 2008 Master Case List, the Lamb Firm had *two* cases against *Bausch and Lomb—Parry and another case*, "*20 - Gladfoller.*"[2] Thus, based on the documents before the court, it does not appear that there was anything false about the estimate that the two cases Lamb had in the *Renu* MDL had an estimated combined value of $1 million. Furthermore, although the 2007 Master Case list did not contain the second *Bausch and Lomb* case, it did disclose a referring attorney, David Carlton, and responsible attorneys Inge Johnstone, Kirk Wood and Micah Adkins, on the *Parry* case (Doc. # 143-7, Ex. 77),

---

[2] Document 162-15 at 9 is somewhat blurry on the court's docket and the correct spelling of this name is quite difficult to discern. However, a review of Document 162-15 makes clear that there is a *Parry v. Bausch and Lomb* case listed at 162-15 at 10, and another *Bausch and Lomb* case listed at 162-15 at 9, each with an estimated value of $500,000.

making any assumption by CFS in 2008 that Lamb would be entitled to the entire fee in that case unjustifiable.  Notably, the e-mail exchange set forth by CFS between Wood, Peoples and Callahan regarding the *Bausch and Lomb* cases does not indicate that anyone represented that Lamb would be entitled to 100% of the estimated $1 million fee.  The referring relationships and responsible attorneys were disclosed to CFS before it extended its initial loan to Lamb in mid-2007.  For CFS to claim that it was not aware of those relationships when additional financing was extended in 2008 is disingenuous, particularly considering the background of the members of CFS.

As to alleged misrepresentations about law firm budgets, CFS was aware at the time it made the initial loan that the Lamb Firm budget provided was not being followed.  The financial statements that CFS reviewed showed that for the period January 2007 - April 2007, Lamb had exceeded his monthly draw each month.  However, CFS's June 6, 2007 internal memo did not express any concern that CFS was not adhering to its budget.  (Doc. # 143-10).

Plaintiff has the burden of presenting affirmative proof of all of the elements of the exception to discharge.  "[C]ourts generally construe the statutory exceptions to discharge in bankruptcy liberally in favor of the debtor ... ."  *In re Miller*, 39 F.3d at 304.  A creditor cannot establish nondischargeability pursuant to Section 523(a)(2)(A) without proof of reliance on intentional misstatements by the debtor.  *City Bank & Trust Co. v. Vann (In re Vann)*, 67 F.3d 277, 280 (11th Cir. 1995).

The fact section of CFS's Response to Lamb's Motion is entirely devoid of any mention of reliance.  Not one record cite addresses the issue.  (Doc. # 162 pp. 6-16).  CFS may have presented evidence which raises fact issues as to falsity or, even in some instances, intent; however, CFS has utterly failed to present any evidence which raises an issue of fact on the reliance element.

In the argument section of its brief, CFS asserts that Lamb's contention that CFS only relied on the case valuations and nothing else is "patently untrue. " (Doc. # 162 at 17).  But CFS provided no factual support for that argument.  Later in its brief, CFS asserts that it "relied upon the Case List and on the representations and warranties in extending credit to Mr. Lamb." (Doc. # 162 at 22).  In support of this assertion, CFS cites to "Ex. A," describing it as "[CFS Decl]."  However, no such document is in the record.[3]

It is Plaintiff's burden to present *evidence* of reliance.  If the evidence existed, meeting this burden should not have been difficult, particularly considering that this matter was tried for a number of days before Judge Bennett.  The court has been unable to locate the declaration cited in the argument section of CFS's briefs as evidence of reliance.  Additionally, CFS's brief is also virtually devoid of any substantive argument regarding reliance.  Rather, CFS appears to assume that reliance is presumed, which is simply not the case.  *In re Vann*, 67 F.3d. 277, 283-84 (11th Cir. 1995) (requiring a creditor seeking to avoid discharging a debtor's debt under § 523(a)(2)(A) to show justifiable reliance).  Moreover, as Lamb correctly notes, what little attention CFS pays to the issue of reliance in its brief focuses primarily on the case valuations.

Based on the record before the court, CFS has failed to establish the third element of § 523(a)(2)(A)—reliance.  The record evidence does not support the conclusion that CFS relied on any of the alleged misrepresentations in entering into the lending relationship with Lamb.  In particular as to the case valuations, even if CFS had presented evidence of reliance, it has not shown that such

---

[3] Exhibit A to CFS's brief is trial testimony, not a declaration.  Within the copy of exhibits CFS provided to the court in support of its Response to Lamb's Motion, none of the documents are separated by tabs.  Nonetheless, the court has reviewed the stack of documents and was able to locate only one sworn statement, the Declaration of Jim Cox of CFS which is Exhibit W.  However, that declaration does not address reliance in any way.  (Doc. # 162-26).

reliance would have been justified. *See In re Sears,* 533 Fed.Appx. at 945-46. Accordingly, Lamb is entitled to summary judgment as to CFS's § 523(a)(2)(A) claim.

      **B.    Count II: 11 U.S.C. § 523(a)(2)(B)**

    The Bankruptcy Code also provides as follows:

> A discharge ... does not discharge an individual debtor from any debt—... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B).

    CFS's assertion that Lamb provided false personal financial statements is appropriate for analysis under the § 523(a)(2)(B) exception. Moreover, CFS claims that Lamb executed a Guaranty attesting that the financial statements submitted to CFS regarding his financial condition fairly represented that financial condition. (Doc. # 162 at 12-15). However, it is CFS's contention that, in reality, Lamb's personal financial statements listed assets that he did not own and that he omitted certain liabilities from those statements. (Doc. # 162 at 12-13).

    For purposes of discharge under § 523(a)(2)(B), "[r]easonable reliance connotes the use of the standard of ordinary and average person." *In re Vann,* 67 F.3d at 280. The reasonableness of a creditor's reliance is to be evaluated based on circumstances of particular case and pertinent questions to consider include:

> • whether there had been previous business dealings with the debtor that gave rise to a relationship of trust;
>
> • whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and

• whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*In re Vann*, 67 F.3d at 280-81.  Reasonable reliance is even a more stringent standard than justifiable reliance.  *Id*. at 280.

As to intent, "[A] court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive. 'Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference [sic] of intent [to deceive].'" *In re Miller*, 39 F.3d  at 305 (quoting *In re Albanese*, 96 B.R. 376, 380 (Bankr. M.D. Fla. 1989)).

CFS has pointed to five (5) assets listed on Lamb's personal financial statements that it claims Lamb did not own:

1.      1228 Cedardell Lane

This court has already held that there is an issue of fact as to whether the Cedardell Property was effectively transferred to Lamb despite a February 6, 2004 warranty deed purporting to transfer it from Jo Ann Kanakis to Lamb.  (Doc. # 150-4).  Therefore, there is an issue of fact as to whether the inclusion of it on the financial statement was false.  Other evidence, including the limited value of this property (subject to mortgage) relative to the overall value of the loan at issue, and CFS's focus on other issues in their follow up questions (Doc. # 143-10), may also be sufficient to raise an issue of fact as to the intent to deceive.[4]

But again, Plaintiff bears the burden on summary judgment of presenting evidence establishing each element of the exception, including reliance.  For the reasons discuss above as to

---

[4] The court notes, however, that the Fourth (last) Promissory Note executed by Lamb in favor of CFS was executed on April 25, 2008.  (Doc. # 162-4).  On May 20, 2008, Lamb executed a quit claim deed conveying the Cedardell Property back to Jo Ann Kanakis.  (Doc. # 150-5).

the application of § 523(a)(2)(A), CFS has failed to raise a genuine issue of fact as to the reliance element of this exception. This failure is fatal to its arguments regarding this property.

      2.      611 Greenwich Circle

This property was the Lambs' marital home. CFS was aware that Lamb was married, thus as of 2007, it should have been aware that it could only reasonably attribute 50% of the property's value to Mr. Lamb. However, as of the submission of updated financial statements in April 2008, which still listed this property as an asset, Lamb had already agreed that Mrs. Lamb would receive ownership in the house as part of the divorce and the divorce decree had been entered on April 2, 2008. (Doc. # 162-21 at 14; AlaCourt Case No. 01-DR-2006-003040.00, listing a 4/2/2008 Divorce Decree). The Fourth (last) Promissory Note executed by Lamb in favor of CFS was executed on April 25, 2008. (Doc. # 162-4). Thus, CFS has established the falsity element of the exception as to the inclusion of this property on Lamb's financial statement for purposes of the extension of additional financing, but not as to the extension of the initial financing.

However, a finding of falsity does not end the court's inquiry. Again, CFS must also establish sufficient evidence of reliance, yet here it has failed to do so. In addition, there is an additional twist to the reliance analysis as to the listing of this property on Lamb's financials. If there were evidence of reliance (which there is not), in evaluating whether it was reasonable for CFS to rely on the representation about this property, a question that must also be considered is "whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *In re Vann*, 67 F.3d at 280-81. Plaintiff has admitted it ran litigation searches to conduct its own evaluation of Lamb's cases. It would have required very minimal investigation to run Lamb's name though AlaCourt to examine Lamb's personal litigation history. Such a simple search would have

revealed his divorce proceeding and the April 2, 2008 Decree. (*See* Alacourt Case No. 01-DR-2006-003040.00, 4/2/2008 Divorce Decree).  Failure to do any such investigation of Lamb's personal litigation history would not have been ordinarily prudent.  *See In re Kisinski (Douglas v. Kosinski)*, 424 B.R. 599, 613 (B. A. P. 1st Cir. 2010) (discussing the investigative steps a reasonable person should take).  If CFS had presented evidence that it relied on Lamb's representation of sole ownership of the 611 Greenwich Circle, that reliance would not have been reasonable because very minimal investigation would have revealed that Lamb no longer owned the property.  Therefore, the court concludes that CFS has failed to establish the reliance element of the § 523(a)(2)(B) exception as to the listing of this property.

> 3.    Law Offices of Archie Lamb LLC with a net value of $75,000,000

The listed value of the Lamb Firm is primarily based on estimated fee income, *i.e.,* the estimated value of a case is the estimate of the fee the firm will eventually receive.  As discussed above, the details of this valuation stem from the firm's Master Case List which (in some instances) gives a case an "estimated value" based on anticipated fees.

The term "financial condition" is not defined in the Bankruptcy Code, and this shortcoming has led to some disagreement as to what is meant by this phrase as used in § 523.  *See, e.g., In re Hilaire,* 2013 WL 5672222 *3-4 (Bkrtcy. N.D. Ga. 2013).  In *In re Kisinski*, 424 B.R. at 610, which is analyzed at length by the court in *In re Hilaire,* the court considered whether information consisting of projections of profit, loss, expenses and net profit for a one year period was a statement respecting a debtor's or an insider's financial condition within the meaning of § 523(a)(2).  That court reasoned that a "statement" respecting "financial condition" "necessarily means that there must be some historical perspective to the figures contained within the statement, and it follows that a

17

statement that provides unsubstantiated projections of future performance does not constitute a statement of financial condition for purposes of § 523(a)(2)." *Id.* at 610; *see also In re Hilaire,* 2013 WL 5672222 *4. Here, the estimated value of the Lamb Firm does not present information relating to the Firm's existing or historical financial condition. Rather, that value provides a projection of possible fee income—that is, mere projections for the future. Thus, under the rationale of *In re Kisinski* and *In re Hilaire,* a rationale which this court adopts, the estimated $75,000,000 value of the Lamb Firm is not a "statement" respecting "financial condition" for purposes of § 523(a)(2)(B).

Moreover, the undisputed evidence shows that the Lamb Firm's estimated value was an estimate with which CFS disagreed. Indeed, CFS's own experts made their own (lower) valuation of the Firm and its cases. Therefore, even if the court were to disagree with *Hilaire* and *Kisinski,* and conclude that the value placed on the firm was a "statement" of "financial condition" within the meaning of § 523(a)(2)(B), CFS still cannot establish the reliance element of § 523(a)(2)(B) for two reasons. First, it is undisputed that CFS prepared its own valuations. Second, CFS has failed to present evidence on the issue of reliance in general.

4.     Vortex Holdings with a net value of $578,028.90

CFS argues that Lamb misrepresented Vortex Holdings's net value because it included assets that Vortex Holdings did not own in placing a net value of $578,028.90 on that entity. CFS further asserts that, in fact, Mr. Kanakis was the owner of several of the properties represented to belong to Vortex Holdings. (Doc. # 162 at 14, 26). In support of this assertion, CFS cites to a print out from the Horry County, South Carolina website which shows Mr. Kanakis owning certain property in Horry County. (Doc. # 162-22). However, CFS failed to provide a record cite to show the existence of any representation that Vortex Holdings owned the property in Horry County listed on that print

out.[5]  Rather, the only financial statement for a Vortex entity that the court was able to locate during its review of the record was for Vortex Properties, and the only property listed on that entity's financial statement was 2900 1st Avenue South, Birmingham, AL.  Therefore, the court concludes that Plaintiff has failed to establish that the representation as to Vortex Holdings was even false. Moreover, CFS's argument that the § 523(a)(2)(B) exception applies to this property suffers from the same infirmity regarding the a failure of proof on reliance that permeates the case.

     5.     2006 IRS Tax Liability

CFS asserts that Lamb's 2007 financial statement constituted a misrepresentation because the statement should have reflected taxes owed for 2006 but it did not.  Peoples prepared Lamb's financial statements and did not include the 2006 taxes owed on the financial statement he prepared for Lamb because, based on Lamb's 2007 losses, Peoples assumed there would be no tax owed for 2006. (Doc. # 143-3, p. 204).  Peoples and Lamb discussed this issue and the estimate that the 2006 taxes due would be offset by the loss in 2007.  (Doc. # 143-3, p. 205).  Based on the 2007 losses, Peoples testified that it didn't "cross his mind" to put either the loss or the credit on the financial statements.  (Doc. # 143-3, p. 205).  Based on this evidence, there is an issue of fact as to the intent to deceive.  However, again, CFS has not presented evidence of reasonable reliance and, thus, has failed to carry its burden as to that required element of the exception.

    **C.**     **Count III: 11 U.S.C. § 523(a)(4)**

Turning now to CFS's claim under § 523(a)(4), "[t]o establish a claim for relief under [that] section, [CFS] must prove the following elements by a preponderance of the evidence:  (1) that a

---

[5]  "It is the non-moving party's obligation to present evidence that precludes the entry of summary judgment ..., the Court is not required to 'scour the record to determine whether there exists a genuine issue of material fact to preclude summary judgment.'" *see, e.g., Compania de Elaborados de Café v. Cardinal Capital Mgmt., Inc.*, 401 F.Supp.2d 1270, 1281 n.5 (S.D. Fla. 2003) (quoting *L.S. Heath & Son, Inc. v. AT & T Info. Sys. Inc.*, 9 F.3d 561, 567 (7th Cir. 1993)).

fiduciary relationship existed [between Lamb and CFS]; and (2) that [Lamb] committed fraud or defalcation in the course of the fiduciary relationship." *In re Richmond,* 429 B.R. 263, 301 (Bkrtcy. E.D. Ark. 2010) (internal quotations and citations omitted but quoting *Jafarpour v. Shahrokhi (In re Shahrokhi)*, 266 B.R. 702, 707 (8th Cir. BAP 2001)); *see also Quaif Yang v. Qin (In re Qin)*, 285 B.R. 292, 296-97 (Bankr. N.D. Iowa 2002).

"The definition of 'fiduciary' for purposes of § 523(a)(4) is a question of federal law." *In re Richmond,* 429 B.R. at 301 (some internal quotations omitted but quoting *R & R Ready Mix, Inc. v. Freier (In re Freier)*, 402 B.R. 891, 898-99, *rev'd on other grounds*, 604 F.3d 583 (8th Cir. 2010)); *Smith v. Khalif (In re Khalif)*, 308 B.R. 614, 621-22 (Bankr. N.D. Ga. 2004). The term fiduciary relationship under Section 523(a)(4) is to be construed narrowly. *Quaif v. Johnson*, 4 F.3d 950, 953 (11th Cir. 1993). "The Supreme Court has consistently held that the term 'fiduciary' is not to be construed expansively, but instead is intended to refer to 'technical' trusts." *In re Fernandez-Rocha*, 451 F.3d 813, 816 (11th Cir. 2006) (quoting *Quaif*, 4 F.3d at 953, and in turn citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934)). "Fiduciary fraud or defalcation requires the existence of an express trust that *pre-exists* the act resulting in a debt." *In re Williams*, 2013 WL 6017464, * 11 (Bkrtcy. M.D. Ga. 2013) (emphasis added) (citing *In re Fernandez-Rocha*, 451 F.3d at 816 and *Quaif*, 4 F.3d at 953); *see also Quaif*, 4 F.3d at 953; *In re Richmond,* 429 B.R. at 301; *In re Freier*, 402 B.R. at 899; *Hunter v. Philpott*, 373 F.3d 873, 875-76 (8th Cir. 2004). "It is not enough that the trust relationship spring[s] from the act from which the debt arose." *In re Richmond*, 429 B.R. at 301 (internal quotations omitted but quoting *Hunter*, 373 F.3d at 877). "A borrower who is allowed to remain in possession or control of a creditor's collateral is not the lender's fiduciary." *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 335 (1934).

20

Other than its assertion that Lamb was a borrower allowed to remain in possession or control of his creditor's collateral–*i.e.*, his cases–CFS has presented no evidence of a fiduciary relationship. It argues that the loan documents create fiduciary duties on Lamb.  However, this evidence, which at best establishes that the fiduciary relationship did not pre-exist the act from which the debt arose, is insufficient as a matter of law to create a fiduciary relationship.  Therefore, CFS has failed to establish that this exception to discharge is even applicable here.

### D.      Count IV: Under 11 U.S.C. § 523(a)(6)

Section 523(a)(6) excepts from discharge "any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  The Eleventh Circuit has held that "proof of 'willfulness' requires 'a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another.'"  *Maxwell v. Jennings (In re Jennings)*, 670 F.3d 1329, 1334 (11th Cir. 2012) (citing *In re Walker,* 48 F.3d 1161, 1163 (11th Cir. 1995)). "[A] debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *In re Walker*, 48 F.3d at 1165; *see also In re Jennings*, 670 F.3d at 1334.  The Supreme Court has held that § 523(a)(6) requires that, in addition to intending the act that lead to an injury, the actor must intend the injury itself, in contrast to an injury which results from recklessness or negligence. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998).  In view of this Circuit's formulation of the willful injury requirement, a plaintiff must show that the debtor defendant had a subjective motive to inflict injury or believed his conduct was substantially certain to cause injury. *In re Jennings*, 670 F.3d at 1334; *In re Lemmon*, 2005 WL 6487216 (citing Restatement (Second) of Torts § 8A); *Petralia v.*

21

*Jercich (In re Jercich)*, 238 F.3d 1202, 1208 (9th Cir. 2001); *Bank of Lumber City v. Rowland (In re Rowland)*, 316 B.R. 759, 763-64 (Bankr. S.D. Ga.2004)).

Within the context of § 523(a)(6), "malicious" means "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *In re Ikner*, 883 F.2d 986, 991 (11th Cir. 1989) (citing *In re Latch*, 820 F.2d 1163, 1166 (11th Cir. 1987)). "Malice may be implied or constructive. ... In other words, 'a showing of specific intent to harm another is not necessary.'" *In re Walker*, 48 F.3d at 1164 (quoting *In re Ikner*, 883 F.2d at 991). Recklessness alone is insufficient to establish willfulness, but it may be sufficient to establish malice, which can either be implied or constructively inferred. *Chrysler Credit Corp. v. Rebhan (In re Rebhan),* 842 F.2d 1257, 1262-63 (11th Cir. 1988). It follows from this analysis that "a wrongful act done intentionally, which necessarily produces harm or which has a substantial certainty of causing harm and is without just cause or excuse, is 'willful and malicious' within the meaning of section 523(a)(6)." *In re Turnage*, 460 B.R. 341, 346 (Bankr. N.D. Ga. 2011).

CFS contends that there is a genuine issue of fact as to whether the damage suffered by it was a result of willful or malicious conduct by Lamb. However, it is CFS's burden to come forward with affirmative proof on each of the elements of the exception to dischargeability. CFS has presented no evidence in the Rule 56 record indicating that Lamb intended to injure CFS or acted with the requisite malice. The court addresses CFS's arguments to the contrary below.

To begin, CFS argues that Lamb "willfully and maliciously injured the property of CFS by, among other things, failing to hold all Records and Collateral in trust for CFS, failing to provide CFS with such Records and Collateral upon request, intentionally interfering with and hindering CFS's ability to collect its Collateral, and walking away from any fees that they would be entitled to collect

in order to prevent the monies from being turned over to CFS." (Doc. # 162 at 30-31). CFS describes the Records at issue as those that "concern his expenditure of the $17.5 million." (Doc. # 162 at 31). CFS's argument as to the records consists in its entirety as follows: "the failure [to turn over the records] itself is evidence that the injury is willful and malicious." (Doc. # 162 at 31). The court disagrees and finds that CFS has utterly failed to present evidence that the failure was intentional, that it was substantially certain to cause injury to CFS, or that it was malicious. In sum, CFS has presented no evidence whatsoever that the alleged failure to maintain records caused CFS any injury.

Rather, the heart of the issues surrounding this exception relates to the Lamb Firm's anticipated fees. Again, CFS argues that the mere fact that they disappeared is evidence of a willful and malicious injury. This argument wholly misconstrues the burden of proof on this issue. CFS has the burden of establishing that the § 523(a)(6) exception applies. However, CFS has shown nothing more than a failure to maintain collateral. "Numerous courts have found that failure to maintain collateral is not enough to prove a willful and malicious injury pursuant to 11 U.S.C. § 523(a)(6)." *In re Harless*, 502 B.R. 581, 595 (Bkrtcy. N.D. Ala. 2013) (citing *Cutler v. Lazzara (In re Lazzara)*, 287 B.R. 714, 723-24 (Bankr. N.D. Ill. 2002) (collecting cases)).

While there may also be evidence that the projected fee value of the Lamb firm dwindled, CFS has presented no evidence of any intentional acts by Lamb that caused that result, nor has it shown any intent by Lamb to sabotage those cases. Rather, Lamb presented undisputed evidence that, in May 2009, CFS took two steps. First , CFS notified all of Lamb's co-counsel in pending cases of its lien. (Doc. # 143-7, Ex. 85). Second, CFS demanded information about and payment of fees that had not yet been earned. (*Id*.). The court need not go so far as to say that some of CFS's

wounds were self-inflicted when it sought that "help."  Suffice it to say that, thereafter, Lamb lost leadership positions in cases and, ultimately, the Lamb Firm ceased doing business.  In the absence of any evidence of an "intentional act [by Lamb,] the purpose of which is to cause injury or which is substantially certain to cause injury," CFS has failed to establish the § 523(a)(6) exception to dischargeability.  *See In re Walker*, 48 F.3d at 1165.

### E.    Waiver

In addition to arguing that CFS has failed to establish any of the exceptions to discharge, Lamb argues that CFS waived any claim that the exceptions apply by continuing to loan funds despite its knowledge of the status of the cases and the financial condition of the firm.  However, because the court has determined that CFS has not presented sufficient evidence to raise a genuine issue of material fact on any of the asserted exceptions to discharge, the court need not address this issue.[6]

## IV.    Conclusion

For the foregoing reasons, the Motion for Summary Judgment filed by filed by Archie Lamb ("Lamb"), ACL Vortex Properties, LLC, Vortex Holdings, LLC, and ACL Vortex Films, LLC, (collectively referred to as the "Lamb Parties") (Doc. # 143) is due to be granted on behalf of Lamb, individually.[7]

A separate order will be entered.

---

[6] Without question, this argument raises a much more fact-intensive question about what specific knowledge CFS had at what time, which is not well suited to resolution on summary judgment, particularly when so little attention was given to the issue in Defendants' brief in support of its Motion.  (Doc. # 144 at 34-35).

[7] The Motion was filed on behalf of Lamb and the Lamb Parties.  Only Lamb received a discharge in bankruptcy.  Therefore, the arguments regarding whether CFS has presented evidence to support any of the exceptions to discharge only apply to the claims against him.  The Lamb Parties assert that CFS's Counsel's represented that Plaintiff would dismiss all other claims if the claims against Lamb were dismissed.  Therefore, they argue, because the Motion is due to be granted as to Lamb, the Lamb Parties should similarly be entitled to summary judgment.  That is not a matter for summary judgment and should be addressed separately from the Motion as to Lamb.

**DONE** and **ORDERED** this _____20th_____ day of March, 2014.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE